**FIRST DIVISION**
**ELLINGTON, C. J.,**
**PHIPPS, P. J., and DILLARD, J.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)
http://www.gaappeals.us/rules/

July 13, 2012

# In the Court of Appeals of Georgia

A12A0716, A12A0717. HUNTER, MACLEAN, EXLEY & DUNN
v. ST. SIMONS WATERFRONT, LLC; and vice versa.

DILLARD, Judge.

This consolidated appeal follows the trial court's judgment granting and denying various aspects of a motion to compel filed by St. Simons Waterfront, LLC ("SSW"). In case number A12A0716, Hunter, Maclean, Exley & Dunn ("Hunter Maclean") appeals the trial court's grant of the motion in favor of SSW, arguing that the trial court abused its discretion by (1) granting relief in excess of that sought in SSW's motion to compel; (2) ruling that the attorney-client privilege does not apply to communications with law firm in-house counsel after a client asserts a claim against the firm; (3) ruling that information developed by a law firm in anticipation of a potential claim asserted against it by a client is subject to discovery; and (4)

ruling that documents created as part of an internal investigation conducted by a law firm regarding its potential liability are subject to discovery if that investigation occurs while the law firm continues to represent the client. In case number A12A0717, SSW appeals the trial court's denial of its motion to compel as it concerns outside counsel consulted by Hunter Maclean and argues that (1) a memorandum created by outside counsel should be subject to discovery because it was created during the time in which Hunter Maclean continued to represent SSW; (2) no attorney-client relationship existed between Hunter Maclean and the outside counsel; (3) there was no indication that Hunter Maclean intended to keep communications with outside counsel secret; (4) Hunter Maclean has waived any privilege; (5) the crime-fraud exception precludes Hunter Maclean from invoking the attorney-client privilege; and (6) if the privilege applies, SSW is entitled to information not protected by the privilege. Because the trial court employed an erroneous legal theory in reaching its decision, we vacate and remand with direction.

I. *Summary of the Relevant Facts.*

a. *Hunter Maclean's Representation of SSW Prior to February 18, 2008.* The record reflects that Hunter Maclean was retained by SSW in 2006 to represent the company through the development and sale of high-end condominiums on St. Simons

2

Island, Georgia. But the relationship between the parties deteriorated after buyers, alleging a variety of reasons, began rescinding the purchase contracts in late 2007-early 2008.

During Hunter Maclean's initial representation of SSW, the primary attorneys working for the client were Triece Ziblut, Jennifer Mafera, and Elizabeth Thompson. Ziblut and Mafera advised the client on transactional matters and Thompson joined the representation as a closing attorney.

When buyers began to rescind in late 2007-early 2008, SSW inquired about the possibility of enforcing the specific-performance provision in the sales contract drafted by Hunter Maclean. But a member of the firm's litigation team advised that he believed it was unlikely a court would grant specific performance due to the large amount of earnest money buyers paid on the high-dollar condominiums (15 percent).[1] And as attempted rescissions continued, Ziblut and Mafera asked Kirby Mason, another member of the firm's litigation team, to review the buyers' claims on behalf of SSW. In this regard, Mason reviewed and revised response letters to the rescinding buyers.

---

[1] The properties ranged in price from approximately $700,000 to $1,000,000.

On February 18, 2008, Ziblut, Mafera, and Mason were all involved in a conference call with the SSW representatives the firm had dealt with throughout the course of the firm's representation, Anna Maria Hatfield and Janet Safran.

b. *The February 18, 2008 Conference Call.* The parties have two differing versions and recollections of this seminal moment in the history of the case.

1. *Hunter Maclean's Version.* According to Mason and Ziblut, the purpose of the call was to advise SSW as to the procedure Mason would use to negotiate with the rescinding buyers concerning the return of earnest money and settlement of claims. Thus, Mason started the conference call by explaining the process and the sufficiency of the buyers' individual claims to Hatfield and Safran when suddenly a male voice came "booming" unexpectedly over the loudspeaker. That voice belonged to Robert Mundy, the president of SSW.

Mason, Mafera, and Ziblut all testified that Mundy was angry with Hunter Maclean and clearly intended to hold the firm responsible for the buyers' rescissions. Both Mafera and Mason took a statement by Mundy to the effect of "live by the sword, die by the sword"[2] to mean that SSW would hold Hunter Maclean responsible

---

[2] *See* The Holy Bible, Matthew 26:52 (Catholic Edition RSV) ("Then Jesus said to him, 'Put your sword back into its place; for all who take the sword will perish by the sword.'").

4

for any losses. Ziblut testified that Mundy wanted to know why settlement was being discussed and said that Hunter Maclean had been hired to protect SSW's interests. Thus, at the conclusion of the call, the three Hunter Maclean attorneys all believed it was probable that SSW would eventually file a claim against the firm.[3]

2. *SSW's Version.* According to Safran and Mundy, Mundy spoke up during the February 18 conference call because he was not interested in settling with the rescinding buyers and instead wanted to pursue specific performance. Mundy said that he did not understand Hunter Maclean's hesitation to pursue specific performance. Safran did not recall Mundy threatening Hunter Maclean, and Mundy testified that he was not looking to bring a claim against Hunter Maclean because there were closings left to finalize. Instead, his intention was to stress SSW's desire to pursue specific performance, not to settle with the buyers. Both Safran and Mundy testified that the decision to sue Hunter Maclean was made only after SSW obtained new counsel.

---

[3] Mason testified that she believed SSW was firing the firm on that call but that there were still closings to finalize. Likewise, Ziblut testified that Mundy was venting his anger and clearly was not looking for Hunter Maclean to serve as counsel any longer than necessary.

c. *Hunter Maclean's Actions after the February 18 Conference Call.* The actions of Hunter Maclean after the February 18 call, as reflected by the record and described below, form the crux of the discovery dispute at issue between the parties—including Hunter Maclean's continued representation of SSW, the undertaking of an internal investigation, Hunter Maclean's consultation with an outside expert, and Hunter Maclean's internal decision regarding a letter that Mafera was drafting for SSW.

1. *Continued Representation of SSW.* Mafera testified that after the February 18 call, there was an immediate decision that the firm should seek outside counsel to handle the buyers' claims for SSW. Thus, Hunter Maclean began efforts to locate a new attorney for SSW on February 19. While SSW sought counsel in Atlanta, Hunter Maclean sought to find local counsel for SSW in the Brunswick area. But as late as early March 2008, the efforts to obtain new counsel remained unsuccessful due to the specialized nature of the buyers' claims, and because the attorneys and firms consulted up to that point all had conflicts of interest.

Meanwhile, Hunter Maclean continued to complete closings and deal with the buyers' claims after February 18. As to the closings, Thompson testified that the last one she conducted on behalf of SSW occurred in April 2008. And Hunter Maclean

6

continued to conduct closings on behalf of SSW even after SSW obtained new counsel. As to the buyers' claims, Mafera testified that Hunter Maclean helped stall, respond to, and negotiate those claims; Ziblut testified that the firm continued to write initial response letters to claims as of February 25 and conducted settlement negotiations at SSW's request; and Mason testified that Hunter Maclean did the best that it could to avoid harm to SSW until new counsel could be obtained, including trying to prevent adverse actions. Indeed, Mason testified that she personally conducted calls with some attorneys for rescinding buyers after February 18. Additionally, Brooks Stillwell—another member of the Hunter Maclean litigation team—counseled SSW after February 18 with regard to rescission letters that required immediate response, advising SSW to "get as many of them closed as quickly as you can and with the least publicity possible" and to initiate "discussions" with buyers.

Nevertheless, Mason opined that the attorney-client relationship between Hunter Maclean and SSW ended after February 18 and that the firm's involvement with SSW after that point merely entailed limited representation during a transitional period of maintaining the status quo.

2. *Hunter Maclean's Internal Investigation of Potential Claims and Defenses.* It is undisputed that after the February 18 conference call, and while continuing to

7

counsel SSW, Hunter Maclean also started looking into its exposure regarding potential claims it thought SSW might assert against the firm. In fact, immediately after the call, Mason went to the office of Arnold Young, in-house general counsel for Hunter Maclean, to report that the firm had been threatened by a client and to inform him of the plan to find new counsel for SSW.

Like Mason, Ziblut also approached Young after the February 18 call and began participating in some of the firm's defense efforts, including meeting with Young, Mafera, Thompson, Mason, and Stillwell, all while continuing to assist SSW. Additionally, Ziblut and Mafera approached Stillwell on February 19 to discuss both how to help SSW with the buyers' claims and the firm's exposure to any potential malpractice that had occurred as part of the SSW representation.

Finally, while she continued to represent SSW in negotiations with the rescinding buyers and actively sought new counsel for SSW, Mason also participated in the internal investigation/defense efforts, acting as in-house counsel with Young on the matter.[4]

---

[4] Although she is a fact witness, Mason also served as co-counsel in the litigation between the parties.

3. *Hunter Maclean's Consultation with Darla McKenzie.* In addition to beginning its internal investigation, Hunter Maclean also contacted Darla McKenzie, an attorney with an Atlanta law firm. Stillwell testified that he initially contacted McKenzie's firm seeking an attorney familiar with the type of claims the buyers were asserting against SSW. Mafera testified that the firm made an internal decision to hire an expert to look at the rescinding buyers' claims and that she personally spoke with McKenzie regarding this issue on February 26.

Stillwell said that he spoke with attorneys at McKenzie's firm in terms of seeking representation for the firm and that he instructed Mafera to contact McKenzie because she had been hired for that purpose. Likewise, Mafera testified that she believed she had an attorney-client relationship with McKenzie when they spoke because she had been told that McKenzie was hired to help assess and analyze the potential claims for Hunter Maclean. Thus, Mafera asserted that the firm needed advice from McKenzie regarding how to proceed and that she believed McKenzie knew that she was acting for the benefit of Hunter Maclean.

Mafera admitted that the firm was still representing SSW against the buyers when McKenzie's advice was sought, and that SSW was never told about McKenzie's hiring or her conclusions because the firm tried to find local counsel to

represent SSW against the buyers, although Mafera did ask McKenzie to recommend counsel for SSW. However, Safran testified that SSW sought McKenzie's representation as it searched for outside counsel and McKenzie declined representation due to a conflict of interest.[5]

Hunter Maclean's responses to SSW's interrogatories and requests for admission contradict the foregoing testimony to some extent. For example, in a response to SSW's first interrogatories, Hunter Maclean listed McKenzie as an attorney "contacted about representing SSW in connection with the buyers' claims." And in response to SSW's first requests for admission, Hunter Maclean admitted that it sought McKenzie's advice while continuing to represent SSW and further responded that "it contacted Ms. McKenzie to analyze the various claims and how best to proceed" and that it "contemplated referring [SSW] to Ms. McKenzie but [SSW] took an adverse position to [Hunter Maclean] before [Hunter Maclean] had the chance to put the two in contact."

4. *Jennifer Mafera's Letter.* Finally, either before or after the February 18 conference call, Mafera began to draft a letter to SSW, at SSW's request, explaining

---

[5] It is unclear from the record whether McKenzie's conflict was due to Hunter Maclean's consultation or some other matter.

the claims asserted by each of the rescinding buyers and providing guidance as to the possible responses to these claims.[6] In addition to Mafera, Stillwell also worked on the letter and Mafera discussed its contents with Ziblut.

On February 25, SSW requested that the letter be sent to it by FedEx, and Ziblut agreed to do so on February 26. SSW then requested the letter again on February 27. However, the letter was never completed and was never sent to SSW because Young advised Mafera to stop drafting it after he perceived that SSW was adverse to the firm.[7]

d. *Reasons for Withdrawal: SSW's Knowledge and Understanding of Potential Conflicts of Interest.* The record reflects that SSW and Hunter Maclean have different understandings regarding why SSW needed to obtain new counsel.

1. *Hunter Maclean's Understanding.* Ziblut testified that at the time of the February 18 conference call, she had already determined that the firm needed to cease

---

[6] According to Mafera and Ziblut, the letter was requested and started prior to the February 18 conference call. Mason testified that SSW only requested the letter during the February 18 call, that the letter was not started until February 21, that both Mafera and Stillwell edited the letter, and that Mafera's testimony on the matter was incorrect.

[7] Mafera also testified that Young saw the letter and knew that it was started prior to the February 18 call.

11

its representation of SSW and that she had informed SSW a few days before the February 18 call that it needed an independent evaluation of the buyers' claims.[8] Ziblut testified that she reiterated this during the February 18 call. Mason also recalled that she explained to SSW on the February 18 call that the company would need outside counsel to evaluate questions surrounding the agreement, because Hunter Maclean had drafted the contract.

As to Hunter Maclean's belief that SSW became adverse to the firm after the February 18 call, Mafera was unsure of whether SSW was ever informed that their perceived threat to the firm had created a new, additional conflict that required Hunter Maclean to withdraw from its representation of SSW. On the other hand, Ziblut testified that she informed SSW's general counsel in South Carolina that she was concerned that SSW had become adverse to the firm, and that she informed SSW that they were adverse to the firm and needed new counsel. Nevertheless, it appears undisputed that Hunter Maclean never informed SSW that the law firm began

---

[8] Mafera further testified that she was told by Ziblut prior to the February 18 call that Ziblut had informed SSW about the potential need for outside counsel due to a possible conflict resulting from Hunter Maclean having drafted the contract the buyers were attempting to rescind.

evaluating its own exposure or building a defense after February 18, or that Mafera, Ziblut, Mason, and Stillwell were participating in preparing that defense.

2. *SSW's Version.* SSW's representatives—Hatfield, Safran, and Mundy—all testified that Hunter Maclean never informed SSW that the firm had a conflict of interest with SSW. Safran testified that Ziblut instructed SSW to obtain outside counsel only because SSW disagreed with Hunter Maclean's advice regarding settlement with the buyers, and because Hunter Maclean could not represent SSW in closings and in litigation after the rescissions because they had drafted the documents. Hatfield likewise testified from her notes that Ziblut told her that Hunter Maclean felt that SSW should obtain new counsel because SSW "was not taking any of their advice on the litigation" and because "[t]hey smell blood in the water and . . . feel like we might turn on them."

e. *Current Lawsuit and Discovery Dispute.* After obtaining new counsel, SSW filed suit against Hunter Maclean, alleging claims for legal malpractice, breach of fiduciary duty, and fraud concerning Hunter Maclean's representation of SSW between 2006 and 2008. Specifically, SSW alleged that Hunter Maclean committed legal malpractice by failing to advise SSW properly on the requirements of the

13

Georgia Condominium Act[9] and to properly draft a form purchase contract, and in its advice and representation of SSW after buyers began to rescind the contract drafted by Hunter Maclean. Additionally, SSW alleged that Hunter Maclean breached its fiduciary duty to SSW by failing to explain the basis for the rescinding buyers' claims, withholding information requested by SSW related to the buyers' claims, continuing to represent SSW in the face of a significant conflict of interest without making full disclosure, contacting an outside attorney while continuing to represent SSW but failing to disclose to SSW the conclusions of that consultation, and misleading SSW as to the true nature of the firm's conflict of interest. Finally, SSW alleged that Hunter Maclean committed fraud by concealing its own negligence, the facts surrounding the rescinding buyers' claims, the consultation and conclusions of the outside expert, and the information related to SSW's claim for breach of fiduciary duty. Thus, SSW sought special damages, general damages, nominal damages, attorneys' fees pursuant to OCGA § 13-6-11, and punitive damages.

As discovery between SSW and Hunter Maclean ensued, SSW sought to depose and obtain documents from Darla McKenzie, the outside legal expert consulted by Hunter Maclean. McKenzie objected to SSW's request for documents

---

[9] *See* OCGA §44-3-70 *et seq*.

on the basis that she had been instructed by counsel for Hunter Maclean that the firm intended to invoke the attorney-client privilege and, thus, objected on that basis and under the work-product doctrine. Hunter Maclean objected to the request for documents and also filed a motion for protective order and motion to quash the deposition of McKenzie, citing the attorney-client privilege and work-product doctrine. To show that an attorney-client relationship existed between Hunter Maclean and McKenzie, Hunter Maclean produced an invoice from McKenzie and her bills to the firm. The trial court granted the protective order and motion to quash on May 6, 2010.

SSW also sought to depose Arnold Young, in-house general counsel at Hunter Maclean. Hunter Maclean filed a motion for protective order and motion to quash the subpoena for the deposition of Young, again citing the attorney-client privilege and work-product doctrine. In support of its motion, Hunter Maclean submitted an affidavit from Young, describing his role at the firm and his involvement in the case after attorneys at Hunter Maclean perceived that SSW intended to hold the firm responsible for losses associated with the rescinding buyers' claims.

In response to these objections by Hunter Maclean and Hunter Maclean's privilege log, which purportedly identified 21 documents created after February 18,

15

2008,[10] SSW filed a motion to compel discovery, arguing that the information obtained from McKenzie would have helped SSW respond to the rescinding buyers' claims, that Young's advice to the attorneys who continued to represent SSW resulted in the firm's breach of fiduciary duty and goes to the heart of SSW's claims, and that SSW was entitled to the information because it was obtained while Hunter Maclean continued to represent SSW. Ultimately, SSW requested that the trial court require Hunter Maclean to produce (1) the letter drafted by Jennifer Mafera, analyzing the buyers' claims but withheld from SSW at Young's direction; (2) a memo drafted by McKenzie and all written communications between her and Hunter Maclean; (3) a memo drafted by Kirby Mason for Arnold Young following the February 18 conference call; (4) inter-firm e-mails from February 21, 2008, regarding recommendations for another firm to handle the buyers' claims; (5) draft statements and handwritten timesheets showing work by Kirby Mason or other attorneys at the firm regarding SSW and the buyers' claims, regardless of whether the firm later billed the client for the work; (6) an opportunity to depose Young; (7) and additional depositions of Jennifer Mafera, Triece Ziblut, Kirby Mason, and Brooks Stillwell

---

[10] The record before us does not contain a copy of Hunter Maclean's privilege log.

16

regarding their understanding and consideration of the State Bar Rules (which include the professional rules of conduct) in dealing with SSW.

On September 15, 2011, the trial court granted SSW's motion to compel except as to the documentary evidence and deposition of McKenzie, based on its finding that the attorney-client privilege applied.[11] With regard to McKenzie, the trial court found that an e-mail between McKenzie and Mafera revealed that McKenzie "did not know that she was potentially representing [Hunter Maclean]." Nevertheless, the court determined that the McKenzie evidence was protected by the attorney-client privilege. As to the remaining requested evidence, the trial court found that time sheets for Hunter Maclean established that the firm continued its representation of SSW through June 2008 on various matters and summarized the ultimate issue as being "whether an attorney-client relationship exists between Arnold Young, Esq. and [Hunter Maclean], and whether the evidence that [SSW] seeks to acquire is protected as work-product by [Hunter Maclean]."

Looking to the Georgia Rules of Professional Conduct, the trial court determined that because Young was a partner at Hunter Maclean, any conflict of

[11] This holding by the trial court forms the basis of SSW's cross appeal in case number A12A0717.

17

interest that applied to other attorneys in the firm would be imputed to Young.[12] And ultimately, the trial court concluded that the firm's representation of SSW continued through June 2008, and Young's representation of Hunter Maclean created a conflict of interest which negated any presumed attorney-client privilege.

In making its findings and determination, the trial court rejected the assertion by Hunter Maclean's legal expert, who opined that the real issue in the case concerned a lawyer's obligations as to when and how to withdraw from a case[13] because the court found that representation of SSW continued not only as to previously scheduled closings but also as to unrelated matters. The trial court also found that SSW "was oblivious" to the fact that Hunter Maclean felt it was potentially in an adverse position to SSW. Thus, the court determined that Hunter Maclean perceived a conflict and began taking immediate action to protect itself but did not inform SSW of the conflict and continued to represent the client. Given the foregoing

---

[12] *See* Ga. Rules of Prof'l Conduct R. 1.7 (conflicts of interest); Ga. Rules of Prof'l Conduct R. 1.10 (imputed disqualification).

[13] *See* Ga. Rules of Prof'l Conduct R. 1.16 (declining or terminating representation).

18

facts, the court below concluded that the attorney-client privilege did not extend to Young or "any other risk management attorney within [Hunter Maclean]."[14]

Likewise, after reiterating that no attorney-client relationship existed between Young and Hunter Maclean, the trial court also determined that because Hunter Maclean continued to represent SSW until at least June 2008, "any documents prepared during that time that relate to [SSW] are not protected by the work-product doctrine," citing our Supreme Court's decision in *Swift, Currie, McGhee & Hiers v. Henry*.[15]

The trial court recognized that the issues before it had not yet been decided by the appellate courts in Georgia and properly granted a certificate of immediate

---

[14] We recognize that in reaching its decision, the trial court relied on *Bank Brussels Lambert v. Credit Lyonnais (Suisse), S.A.*, 220 F.Supp2d 283, 287-88 (III) (A) (S.D. N.Y. 2002). Our departure from this case and others with similar holdings is discussed *infra* at footnote 26. The trial court also relied on this Court's decision in *Dick v. Williams*, 215 Ga. App. 629 (452 SE2d 172) (1994), in which we held that "[l]awyers practicing in the same firm should not be allowed to create multiple legal entities and parcel their clients among them in order to circumvent an otherwise existing conflict, and it necessarily follows that they should not be able to do so in order to allow some lawyers in the firm to have an 'interest' in a particular matter while others do not." *Id.* at 632 (1). Given the factual distinction between the situation at issue in *Williams* and that with which we are concerned in the case *sub judice* (*i.e.*, the ability of a law firm to maintain attorney-client privilege with in-house counsel), the holding of *Williams* is inapposite and trial court's reliance on same is misplaced.

[15] 276 Ga. 571 (581 SE2d 37) (2003).

19

review. We then granted Hunter Maclean's application for interlocutory appeal, and the appeals in case numbers A12A0716 and A12A0717 followed.

At the outset, we note that a trial court's discovery order is reviewed on appeal for an abuse of discretion.[16] And it is within the trial court's discretion "to determine the permissible extent of discovery, keeping in mind that the discovery procedure is to be construed liberally in favor of supplying a party with the facts."[17] With these preliminary guiding principles in mind, we turn now to the parties' claims in both appeals.

## II. *Case Numbers A12A0716 and A12A0717.*

In case number A12A0716, Hunter Maclean appeals the trial court's grant of SSW's motion to compel, which holds that the attorney-client privilege and work-product doctrine does not apply in the case *sub judice* to any communications except the firm's consultation with outside counsel, Darla McKenzie. In case number A12A0717, SSW appeals the trial court's denial of its motion to compel as it

---

[16] *See, e.g.*, *McMillian v. McMillian*, 310 Ga. App. 735, 737 (713 SE2d 920) (2011); *Rose v. Commercial Factors of Atlanta, Inc.*, 262 Ga. App. 528, 528 (586 SE2d 41) (2003).

[17] *Tenet Healthcare Corp. v. La. Forum Corp.*, 273 Ga. 206, 210 (1) (538 SE2d 441) (2000).

concerns Hunter Maclean's communications with McKenzie. We will address these

contentions together in our determination that it is necessary to remand this case to

the trial court for additional proceedings consistent with this opinion.

a. *Attorney-Client Privilege.*

The attorney-client privilege "is the oldest of the privileges for confidential

communications known to the common law."[18] And in Georgia,[19] our law provides

that "[c]ommunications to any attorney or to his employee to be transmitted to the

attorney pending his employment or in anticipation thereof shall never be heard by

the court" and that "[t]he attorney shall not disclose the advice or counsel he may give

to his client . . . ."[20] Additionally, no attorney "shall be competent or compellable to

testify for or against his client to any matter or thing, the knowledge of which he may

have acquired from his client by virtue of his employment as attorney or by reason of

---

[18] *United States v. Jicarilla Apache Nation*, __ U.S. __, __ (II) (131 SCt 2313, 180 LE2d 187) (2011) (punctuation omitted).

[19] *See* OCGA § 24-9-21 (2) ("There are certain admissions and communications excluded on grounds of public policy. Among these are . . . [c]ommunications between attorney and client . . . .").

[20] OCGA § 24-9-24.

21

the anticipated employment of him as attorney."[21] Likewise, no party or witness "shall be required to make discovery of the advice of his professional advisers or his consultation with them."[22]

The foregoing statutory provisions reflect the public policy that "persons should feel that they may securely say anything to members of the profession in seeking aid in their difficulties, although the person whose advice they seek may have been employed, or may be afterwards employed, against them."[23] However, inasmuch as the exercise of the privilege results in the exclusion of evidence, "a narrow construction of the privilege comports with the view that the ascertainment of as

---

[21] OCGA § 24-9-25.

[22] OCGA § 24-9-27 (c); *see also Expedia, Inc. v. City of Columbus*, 305 Ga. App. 450, 452-53 (699 SE2d 600) (2010) ("The attorney-client privilege[,] which protects confidentiality in furtherance of effective representation and the due administration of justice, is of unquestionable importance.").

[23] *Tenet Healthcare Corp.*, 273 Ga. at 208 (1) (punctuation omitted); *see also* OCGA § 24-9-21 (2); *Upjohn Co. v. United States*, 449 U.S. 383, 389 (II) (101 SCt 677, 66 LE2d 584) (1981) (explaining that purpose of attorney-client privilege is "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice").

many facts as possible leads to the truth, the discovery of which is the object of all legal investigation."[24]

In considering the scope of the attorney-client privilege, we begin by noting that the privilege undoubtedly protects communications between corporate employees and in-house counsel.[25] But no such bright-line rule exists for attorneys who consult with their law firm's in-house counsel regarding a potential malpractice claim by a current client. Rather, courts that have addressed this issue have taken a variety of approaches. Many courts have held that the attorney-client privilege does not protect otherwise privileged communications or legal advice in which the firm's

---

[24] *Tenet Healthcare Corp.*, 273 Ga. at 208 (1) (punctuation omitted).

[25] *See Upjohn*, 449 U.S. at 394 (II) ("Consistent with the underlying purposes of the attorney-client privilege, these communications must be protected against compelled disclosure."); *see also Fire Ass'n of Philadelphia v. Fleming*, 78 Ga. 733, 737 (3) (3 SE 420) (1887) (holding that it was error to force production of letter between attorney and corporate client); *S. Guar. Ins. Co. of Ga. v. Ash*, 192 Ga. App. 24, 27 (383 SE2d 579) (1989) ("[O]nce an attorney-client relationship has been duly established between an attorney and his corporate client[,] . . . the legal advice confidentially communicated to the authorized agents of the client is by statute protected from discovery, and testimony concerning the content of such advice is inadmissible on grounds of public policy." (emphasis omitted)); *Marriott Corp. v. Am. Acad. of Psychotherapists, Inc.*, 157 Ga. App. 497, 503 (3) (d) (277 SE2d 785) (1981) (holding that "a corporation can in fact avail itself of the attorney/client privilege" and establishing a five-part test with which to determine whether communications from a corporate client to counsel are protected by the privilege).

23

representation of itself created a conflict of interest between the firm and the client seeking the communications or material, automatically imputing a conflict of interest to in-house counsel.[26] More recently, however, a federal district court has held that such communications are protected and are discoverable only if the client can show good

---

[26] *See Koen Book Distributors v. Powell, Trachtman, Logan, Carrle, Bowman & Lombardo, P.C.*, 212 F.R.D. 283, 285 (E.D. Pa. 2002) ("[W]e must determine whether the defendant law firm engaged in a conflict of interest, that is, representation adversely implicating or affecting the interests of the plaintiffs, when it was receiving information from and/or providing legal advice to several of its lawyers while at the same time continuing to represent those plaintiffs."); *In re Sunrise Securities Litigation*, 130 F.R.D. 560, 597 (I) (E.D. Pa. 1989) (on motion for reconsideration) (holding that privilege would protect "only those otherwise privileged documents withheld by [the law firm] which do not contain communications or legal advice in which [the law firm's] representation of itself violated Rule 1.7 with respect to a [law firm] client seeking the document"); *see also In re SONICblue Inc.*, Adversary No. 07-5082, 2008 WL 170562, at *10 (Bankr. N.D. Cal. Jan 18, 2008); *Burns v. Hale & Dorr LLP*, 242 F.R.D. 170, 173 (II) (A) (1) (D. Mass. 2007); *Bank Brussels Lambert v. Credit Lyonnais (Suisse), S.A.*, 220 F.Supp2d 283, 287-88 (III) (A) (S.D. N.Y. 2002); *VersusLaw, Inc. v. Stoel Rives, LLP*, 111 P3d 866, 878-79 (¶ 55)-(¶ 56) (Wash. App. 2005).

cause to overcome the privilege.[27] Under this approach, it is for the trial court, employing a balancing test, to determine the existence of good cause.[28]

Georgia has yet to address the applicability of the attorney-client privilege to a law firm's in-house communications concerning a current client. To put it plainly, we are in uncharted jurisprudential waters. And while opinions from other jurisdictions can and often are useful in providing guidance on novel questions of law, our charge as a *Georgia* appellate court is to outline an analytical framework for the issue before us that is, to the greatest extent possible, firmly rooted in this state's statutes, case law, and rules of professional conduct. In our view, none of the decisions from other jurisdictions addressing this issue do so in a way that is entirely consistent with Georgia law.[29] Hunter Maclean, however, has directed our attention

---

[27] *See Tattletale Alarm Sys., Inc. v. Calfee, Halter & Griswold, LLP*, No. 2:10-cv-226, 2011 WL 382627, at *9-10 (II) (C) (S.D. Ohio Feb. 3, 2011) (applying the reasoning in *Garner v. Wolfinbarger*, 430 F2d 1093 (5th Cir. 1970), a case concerning a stockholder action, to consider factors that might establish good cause to overcome the privilege, but ultimately holding that privilege applied to the documents in question).

[28] *Id.*

[29] In this regard, as further discussed *infra*, we find no overt support within our prior case law, statutes, or rules of professional conduct to warrant adopting the sweeping, bright-line rule of automatic imputation of conflicts of interest to in-house counsel. *See* Francis J. Menton, Jr., *Does the Attorney-Client Privilege Cover a Law*

25

to a law review article that we find to be in accord with the general principles of Georgia law outlined in this opinion, and one that provides an analytical framework striking the proper balance between safeguarding the integrity of the attorney-client privilege and honoring this state's vigorous and necessary conflict rules. For these reasons, we quote extensively from this article throughout our opinion, and reference (where necessary) the general principle of Georgia law upon which the quoted language is based. And as noted in greater detail *infra*, we are persuaded by—and thus adopt as our own—the article's conclusion that whether a law firm may claim privilege to legal advice regarding duties to a current client from in-house counsel "depends on whether there is a conflict of interest between firm counsel's duty to the law firm and firm counsel's duty to the outside client."[30] This question, as explained below, is largely a factual one, to be decided by the trial court.

---

*Firm's Consultation With In-House Counsel About Issues Involving Current Clients?*, 10 Engage: J. Federalist Soc'y Prac. Groups 111, 111 (July 2009) (criticizing automatic-imputation rule as failing to "recognize the practical realities of firms attempting to identify and react appropriately to developing conflicts in ongoing situations"); *see also Garvy v. Seyfarth Shaw LLP*, 966 NE2d 523, 536 (¶ 35) (Ill. App. 2012) (declining to adopt the automatic-imputation rule employed by other jurisdictions).

[30] Elizabeth Chambliss, *The Scope of In-Firm Privilege*, 80 NOTRE DAME L. REV. 1721, 1745 (II) (C) (2005).

At this juncture, it is important to emphasize that in Georgia "[a] lawyer's representation of a client [when] the lawyer has a financial or personal interest which will or reasonably may affect the lawyer's professional judgment illustrates one of the most blatant appearances of impropriety."[31] Indeed, when an attorney's own personal interests come into conflict with those of his client, "it threatens the attorney's duty of loyalty, the most basic of an attorney's duties to the client."[32] Thus, the standards governing "[t]he requirements of full disclosure and written notice to or consent from the client are intended to insure to some extent both that a client will receive professional legal services, and that a lawyer may be protected should he or she choose the risky course of representing a client despite the lawyer's potentially conflicting personal or financial interest."[33]

---

[31] *In the Matter of Oellerich*, 278 Ga. 22, 23 (596 SE2d 156) (2004) (per curiam) (punctuation omitted).

[32] J. RANDOLPH EVANS & SHARI L. KLEVENS, GEORGIA LEGAL MALPRACTICE 169 (2011).

[33] *In the Matter of Oellerich*, 278 Ga. at 23 (punctuation omitted). There are, however, some conflicts that are nonwaivable. *See* Ga. Rules of Prof'l Conduct R. 1.7 (c) ("Client informed consent is not permissible if the representation: (1) is prohibited by law or these Rules; (2) includes the assertion of a claim by one client against another client represented by the lawyer in the same or a substantially related proceeding; or (3) involves circumstances rendering it reasonably unlikely that the lawyer will be able to provide adequate representation to one or more of the affected

Nevertheless, we reject the Draconian rule adopted in other jurisdictions that automatically imputes conflicts of interest to in-house counsel, because there is no explicit textual justification for such an approach in this State's rules of professional conduct,[34] and adopting such a bright-line rule would, in our view, encroach upon the authority of our Supreme Court over such matters.[35] Moreover, even if we were authorized to establish such a rule, we would nevertheless decline to do so because automatic imputation, *inter alia*, increases the cost of privileged advice by requiring firms to either retain outside counsel or hastily withdraw from the representation.[36] Additionally, this approach "discourage[s] firms from seeking early advice when

---

clients."). *See generally Lewis v. State*, 312 Ga. App. 275, 280-81 (1) (718 SE2d 112) (2011) (Blackwell, J.) (providing an in-depth discussion concerning conflicts of interest).

[34] To the extent that Rule 1.10 can be read to endorse such a sweeping rule, *see* Menton, *supra* note 29, at 113 (questioning the realistic ability to quarantine in-house counsel in light of Rule 1.10), we reject such an interpretation/application of the rule in the context of in-house counsel for law firms because adopting same would lead to patently absurd results, as discussed *infra*, and this Court "may construe statutes [and the like] to avoid absurd results." *State v. Mussman*, 289 Ga. 586, 589 (1) (713 SE2d 822) (2011) (punctuation omitted).

[35] *See In the Matter of Turk*, 267 Ga. 30, 31 (1) (471 SE2d 842) (1996) (per curiam) (noting the Supreme Court's "inherent and exclusive power to regulate the practice of law" in Georgia).

[36] Chambliss, *supra* note 30, at 1747 (II) (C).

problems with clients arise . . . .,"[37] thereby precluding a robust and frank assessment of potential conflicts and undermining conformity with ethical obligations.[38] And the firm's "duty of loyalty to the client does not prevent the firm from attempting to defend against client claims" because the effort to defend "is no more 'disloyal' when it involves inside rather than outside counsel."[39]

Indeed, in this very case, the facts demonstrate why a bright-line rule is entirely untenable. A lawyer who has a nonwaivable conflict of interest with a client no doubt must withdraw, but a firm concerned with whether a client has a malpractice claim against it will often need to carefully consider that question. Yet, a lawyer who much withdraw clearly cannot do so in a way that violates his ethical obligations to the client. What then is a conflicted lawyer to do when there are multiple on-going representations and, despite the lawyer's reasonable efforts, replacement counsel is unable to quickly step in and take over the representation? In such a situation, the conflicted lawyer finds himself in the awkward position of either hastily withdrawing in violation of the professional rules of conduct, having to consult with (and hire)

---

[37] *Id.*

[38] Menton, *supra* note 29, at 111-12.

[39] Chambliss, *supra* note 30, at 1748 (II) (C).

outside counsel, or risk waiver of the privilege. Suffice it to say, we think it strains

credulity to suggest that there is any basis in Georgia law for adopting a rule that

places clients in the perilous position of having their lawyers withdraw prematurely

or without careful advice. Accordingly, we conclude that the scope and applicability

of the attorney-client privilege in circumstances like those presented in the case *sub*

*judice* depends entirely on the specific facts of each given case.[40]

In considering the nuanced interplay between the attorney-client privilege and

our conflict rules, it is helpful to begin with Rule 1.10 of the Georgia Rules of

Professional Conduct, which provides as follows:

a. While lawyers are associated in a firm, none of them shall knowingly
represent a client when any one of them practicing alone would be

---

[40] *Id.* at 1745 (II) (C); *see* Ga. Rules of Prof'l Conduct R. 1.7 (a) ("A lawyer shall not represent or continue to represent a client if there is a significant risk that the lawyer's own interests or the lawyer's duties to another client, a former client, or a third person will materially and adversely affect the representation of the client . . . ."); Ga. Rules of Prof'l Conduct R. 1.7 (b) ("If client informed consent is permissible a lawyer may represent a client notwithstanding a significant risk of material and adverse effect if each affected client . . . gives informed consent, confirmed in writing, to the representation after . . . consultation with the lawyer . . ., having received in writing reasonable and adequate information about the material risks of and reasonable available alternatives to the representation, and . . . having been given the opportuinty to consult with independent counsel."); *see also* Ga. Rules of Prof'l Conduct R. 1.0 (b) (defining "confirmed in writing"); Ga. Rules of Prof'l Conduct R. 1.0 (h) (defining "informed consent").

prohibited from doing so by Rule 1.7: Conflict of Interest: General Rule, 1.8 (c): Conflict of Interest: Prohibited Transactions, 1.9: Former Client or 2.2: Intermediary.

b. When a lawyer has terminated an association with a firm, the firm is not prohibited from thereafter representing a person with interests materially adverse to those of a client represented by the formerly associated lawyer unless:

> 1. the matter is the same or substantially related to that in which the formerly associated lawyer represented the client; and

> 2. any lawyer remaining in the firm has information protected by Rules 1.6: Confidentiality of Information and 1.9 (c): Conflict of Interest: Former Client that is material to the matter.

c. A disqualification prescribed by this rule may be waived by the affected client under the conditions stated in Rule 1.7: Conflict of Interest: General Rule.

Imputed disqualification is also referred to as "vicarious disqualification," and it "occurs when one attorney could handle the matter if he were a sole practitioner but is prohibited [from doing so] because of a relationship with a partner or an associate who is barred from the same representation."[41] And as the comments to Rule 1.10

---

[41] EVANS & KLEVENS, *supra* note 32, at 177.

illustrate, the provisions contained therein derive from the duty of loyalty an attorney

owes his client, in that

> [s]uch situations can be considered from the premise that a firm of
> lawyers is essentially one lawyer for purposes of the rules governing
> loyalty to the client, or from the premise that each lawyer is vicariously
> bound by the obligation of loyalty owed by each lawyer with whom the
> lawyer is associated.[42]

Nevertheless, when firm counsel "individually has no conflict of interest under

Rule 1.7 or Rule 1.9, and the in-firm communication meets the ordinary requirements

for privilege," we conclude that "courts should not automatically impute a conflict

under Rule 1.10."[43] Instead, imputation should depend on "the structure of the in-

house position."[44] Thus, when "firm counsel holds a full-time position and does not

---

[42] Ga. Rules of Prof'l Conduct R. 1.10, cmt. 6.

[43] Chambliss, *supra* note 30, at 1748 (II) (D); *see* Ga. Rules of Prof'l Conduct Rule 1.7; Ga. Rules of Prof'l Conduct R. 1.9; Ga. Rules of Prof'l Conduct R. 1.10; *see also Hertzog, Calamari & Gleason v. Prudential Ins. Co. of Am.*, 850 F.Supp. 255, 255 (S.D.N.Y. 1994) ("The privilege attaches to communications with in-house counsel if the individual in question is acting as an attorney, rather than as a participant in the underlying events.").

[44] Chambliss, *supra* note 30, at 1748 (II) (D).

represent outside clients, courts should not impute a conflict under Rule 1.10."[45] In this regard, compensation is perhaps the clearest way to demarcate firm counsel's role, particularly through the use of billing procedures "to establish the firm as the client and to distinguish the lawyer who acts as firm counsel from other lawyers in the firm."[46] The role can be further demarcated by ensuring that its function is known and understood throughout the firm, that its compensation is not significantly determined by firm profit, and other similar measures.[47]

---

[45] *Id.* This "exception to imputation is justified by the structural segregation of the in-house position and the formal designation of the firm as firm counsel's only client." *Id.*

[46] *Id.* at 1749 (II) (D). *See generally* Elizabeth Chambliss, *The Professionalization of Law Firm In-House Counsel*, 84 N.C. L. Rev. 1515, 1520-21 (2006) (providing examples of in-house counsel positions and describing the benefits of firm counsel who are compensated directly for in-house service and who give up outside practice).

[47] *See generally* Mark J. Fucile, *The Double Edged Sword: Internal Firm Privilege and the 'Fiduciary Exception'*, 76 DEF. COUNS. J. 313, 317-18 (IV) (July 2009) (suggesting the following steps for establishing privilege in the first place: "(a) formally designating internal counsel (whether by position, title or committee) so the 'attorney' side of the attorney-client privilege is clearly delineated; (b) not mixing lawyers providing the advice with those receiving it so the 'client' side of the attorney-client privilege is equally demarcated; (c) billing internal counsel's time (and that of the firm lawyers seeking the consultation) to the firm so that it will be clear that firm itself is the client for the advice rendered; and (d) giving (and keeping) the advice in a confidential setting for the same reasons done so generally for the privilege to attach and to be preserved" (footnotes omitted)); Barbara S. Gillers,

Additionally, courts should not impute a conflict to part-time firm counsel when "the lawyer who serves in that capacity does so on a formal, ongoing basis, such that the firm is clearly established as the client before the in-firm communication occurs."[48] So long as counsel in this position has had "no involvement in the outside representation at issue and the firm is clearly established as the client before the in-firm communication occurs, firm counsel should be treated as the functional equivalent of corporate in house counsel."[49] Put simply, "the same lawyer who

---

*Preserving the Attorney Client Privilege for the Advice of a Law Firm's In-House Counsel*, 2000 PROF. LAW. 107, 111 (C) (2000) (suggesting the following steps to maintain privilege when in-house counsel is consulted for ethics advice: (1) identify specifically the attorneys who will give legal advice to firm; (2) set up a separate billing number for the firm matter; (3) distinguish between firm attorneys who are clients and firm attorneys who are counsel with those who are counsel having no involvement in the underlying matters; (4) inform firm employees that cooperation is necessary, communications confidential, and to keep communications confidential; and (5) inform employees who are interviewed about potential conflicts under Rule 1.13).

[48] Chambliss, *supra* note 30, at 1749 (II) (D). Although the outside practice of counsel in such a position may lead to individual conflicts of interest (for example, when counsel formerly represented the current client seeking discovery), "the maintenance of an outside practice, per se, presents no additional argument in favor of imputation." *Id.*

[49] *Id.*

represents the outside client cannot simultaneously represent the firm in a dispute between the firm and that client without the informed consent of both clients."[50]

As for lawyers who act as firm counsel on an *ad hoc* basis (*e.g.*, when the firm does not have a formal in-house counsel position or when firm counsel delegates matters to other attorneys inside the firm), these individuals "should be subject to imputation unless the firm can show that an attorney-client relationship was established before the in-firm communication occurred," which shifts the burden to the law firm "to show that the identity and role of 'firm counsel' was clearly defined."[51] And as to the delegation of matters by firm counsel to ad hoc counsel, even if in-firm counsel is structured such that the attorney in that position is not subject to an imputed conflict of interest, a conflict of interest may nevertheless result if in-firm counsel delegates tasks to or directs aspects of the client representation through attorneys who *are* subject to imputation. Thus, in-house counsel must remain completely separate from any representation of the client, except for the limited

---

[50] Chambliss, *supra* note 30, at 1745 (II) (C).

[51] *Id.* at 1749 (II) (D). Ad hoc firm counsel "should bill the firm for time spent on in-house matters, or at least create a separate billing number in order to record the time spent." *Id.*

purpose of gathering information from any attorneys previously involved in or still involved in the representation of the client.[52]

By following the foregoing approaches, this "eliminates the need to distinguish between communication that occurs prior to, versus in response to, a claim by the client."[53] And the distinction of when a communication occurs is then relevant "only to an analysis of waiver [when] firm counsel has a conflict of interest individually or

---

[52] We pause to emphasize that we are concerned in this opinion *not* with a situation in which an attorney seeks in-house ethics advice or counsel regarding potential malpractice and the attorney's resulting obligations to the client, and nothing written in this opinion should be construed as discouraging the candid disclosure of information that should and must occur in furtherance of the duty of loyalty owed to a client. *See, e.g.*, Ga. Rules of Prof'l Conduct R. 1.6, cmt. 7A ("A lawyer's confidentiality obligations do not preclude a lawyer from securing confidential legal advice about the lawyer's personal responsibility to comply with these Rules. In most situations, disclosing information to secure such advice will be impliedly authorized for the lawyer to carry out the representation."); Ga. Rules of Prof'l Conduct R. 5.1, cmt. 3 (noting that "[s]ome firms . . . have a procedure whereby junior lawyers can make confidential referral of ethical problems directly to a designated senior partner or special committee"). Instead, we are concerned with issues that arise in an adversarial context and the communications that occur when a law firm takes steps to protect itself against a perceived or certain malpractice threat by a client.

[53] Chambliss, *supra* note 30, at 1750 (II) (D).

by imputation."[54]As Professor Elizabeth Chambliss aptly explains in her thoughtful law review article, *The Scope of In-Firm Privilege*,

> if a lawyer acts as firm counsel on an ad hoc basis and does not qualify for an exception to the ordinary imputation of conflicts, but the communication at issue occurred in response to an assertion of wrongdoing by the client, then the client's willingness to continue the representation might be viewed as a waiver of the imputed conflict. [When] the firm discovers potential wrongdoing and promptly notifies the client, there also may be an argument for waiver if the client elects to continue the representation. [When] the firm discovers potential wrongdoing and has not yet notified the client, however, there is no argument for waiver, [because] the client has not been informed of firm counsel's potential conflict.[55]

With regard to the waiver of firm counsel's imputed conflict, it must be remembered that law firms have ethical duties to inform clients of decisions or circumstances with respect to which the client's informed consent is required,[56] and

---

[54] *Id.*

[55] *Id.*

[56] *See* Ga. Rules of Prof'l Conduct R. 1.4 (a) (1) ("A lawyer shall . . . promptly inform the client of any decision or circumstance with respect to which the client's informed consent . . . is required by these Rules . . . ."); *see also* Ga. Rules of Prof'l Conduct R. 1.0 (h) ("'Informed consent' denotes the agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information

if the firm fails to provide "adequate notice to the client of the firm's potentially adverse interests, the firm has no argument for waiver of firm counsel's imputed conflict."[57] This comports with the American Bar Association's determination that consultation with in-house counsel "does not give rise to a per se conflict of interest between the firm and its client, although a personal conflict will arise if the principal goal of the . . . consultation is to protect the interest of the consulting lawyer or law firm from the consequences of a firm lawyer's misconduct."[58] In that situation, "the representation may continue only if the client gives informed consent."[59] Furthermore, it must be remembered that there is a crime-fraud exception to the attorney-client

and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct.").

[57] Chambliss, *supra* note 30, at 1751 (II) (D).

[58] ABA Comm. On Ethics and Prof'l Responsibility, Formal Op. 08-453 (2008).

[59] *Id.*; *see also Paul v. Smith, Gambrell & Russell*, 267 Ga. App. 107, 110 (599 SE2d 206) (2004) ("While a conflict of interest may be waived, such waiver must be knowingly made after full disclosure of all facts. If a client's written consent (or a lawyer's written notice to the client) does not include the required full disclosure as part of the writing, it must contain some recognition that the client's decision and consent were made with knowledge of the potential conflict of interest. In other words, the required writing must at least acknowledge the disclosure essential to an informed decision and consent." (punctuation omitted)); Fucile, *supra* note 47, at 316 (III) (discussing ABA Formal Ethics Opinion 08-453 and disclosure requirements).

privilege,[60] and it is arguable that any knowing nondisclosure of a conflict under the applicable rules of professional conduct would fall under such an exception, such as when a firm seeks in-house counsel's advice to conceal a conflict from the client.[61]

Given these considerations, we are mindful that there may be situations in which our rules of professional conduct require withdrawal from representing a client[62] but in which withdrawal would harm the client, thereby implicating other

---

[60] *See Both v. Frantz*, 278 Ga. App. 556, 563 (5) (629 SE2d 427) (2006) ("[I]t is clear that the attorney-client privilege does not cover communications with respect to proposed or ongoing infractions of the law in the commission of a crime, or the perpetration of a fraud."); *In re Fulton County Grand Jury Proceedings*, 244 Ga. App. 380, 382 (535 SE2d 340) (2000) ("[T]he attorney-client privilege does not extend to communications which occur before perpetration of a fraud or commission of a crime and which relate thereto."); *see also Rose*, 262 Ga. App. at 529 (holding that applicability of crime-fraud exception "depends upon whether a prima facie case has been made that the communication was made in furtherance of an illegal or fraudulent activity").

[61] *See* Restatement (Third) of The Law Governing Lawyers § 82 (b) cmt. d (2000) ("The authorities agree that the exception . . . applies to client conduct defined as a crime or fraud. Fraud, for the purpose of the exception, requires a knowing or reckless misrepresentation (or nondisclosure when applicable law requires disclosure) likely to injure another . . . ."); *see also* Chambliss, *supra* note 30, at 1751 (II) (D).

[62] *See* Ga. Rules of Prof'l Conduct R. 1.7 (a) ("A lawyer shall not represent or continue to represent a client if there is a significant risk that the lawyer's own interests or the lawyer's duties to another client, a former client, or a third person will materially and adversely affect the representation of the client, except as permitted [by obtaining the client's informed consent]."); Ga. Rules of Prof'l Conduct R. 1.7 (c) (listing the situations in which informed consent is impermissible); *see also* Ga.

ethical obligations.[63] In such circumstances, a law firm would be well advised to explain in writing the firm's perception and (1) seek the client's informed consent for an immediate withdrawal, disclosing to the client the potential harm that could result from such withdrawal, and/or (2) seek the client's informed consent to continued representation until such time as the firm can withdraw, with disclosure that the firm will simultaneously take steps to protect its own interests.[64] Nevertheless, in the latter option, in conformance with the propositions discussed *supra*, the firm should segregate the attorneys who will continue with the client representation and the

---

Rules of Prof'l Conduct R. 1.16 (a) (1) ("[A] lawyer shall not represent a client or, where representation has commenced, shall withdraw from the representation of a client if . . . the representation will result in violation of the Georgia Rules of Professional Conduct or other law . . . .").

[63] *See* Ga. Rules of Prof'l Conduct R. 1.16 (b), (d).

[64] *See* Ga. Rules of Prof'l Conduct R. 1.7 (b) (describing process for obtaining informed consent); Ga. Rules of Prof'l Conduct R. 1.10 ; *see also* William T. Barker, *Law Firm In-House Attorney-Client Privilege Vis-A-Vis Current Clients*, 70 DEF. COUNS. J. 467, 471 (Oct. 2003) ("There is no reason to deny [the privilege] to lawyers the client has chosen to continue using, even after a known dispute with those lawyers has arisen. In a very real sense, the client creates this problem by continued use of the lawyer, and the client ought not to reap a collateral advantage in the dispute from choosing to do so. Especially, the client ought not to do so where the law firm is not free to withdraw.").

attorneys who will conduct the investigation, except for the limited purpose of providing pertinent information necessary to begin the investigation.[65]

Having articulated the proper standard to apply, we must remand to the trial court for additional fact finding. On remand, the trial court should evaluate whether the communications at issue otherwise meet the standard for attorney-client privilege. In reaching this determination, "the trial court should consider the totality of the circumstances" and "[i]n addition to the requirement that an attorney-client relationship exists, relevant factors generally include, but are not limited to, the nature and purpose of the communication and how and to whom the communication was made."[66]

---

[65] *See* Ga. Rules of Prof'l Conduct R. 1.7 (c) (2), (3) ("Client informed consent is not permissible if the representation . . . [i]ncludes the assertion of a claim by one client against another client represented by the lawyer in the same or substantially related proceeding . . . ." or "[i]nvolves circumstances rendering it reasonably unlikely that the lawyer will be able to provide adequate representation to one or more of the affected clients."); Ga. Rules of Prof'l Conduct R. 1.10 (a) ("While lawyers are associated in a firm, none of them shall knowingly represent a client any one of them practicing alone would be prohibited from doing so by Rules 1.7: Conflict of Interest: General Rule . . . .").

[66] *Ga. Cash Am., Inc. v. Strong*, 286 Ga. App. 405, 412 (4) (649 SE2d 548) (2007) (punctuation omitted) (physical precedent); *see also Calhoun v. Tapley*, 196 Ga. App. 318, 319 (395 SE2d 848) (1990) ("Generally, the relation of attorney and client is a matter of contract but the contract may be express, or implied from the conduct of the parties. The employment is sufficiently established when it is shown

If the communications in question meet the foregoing standard, the court should then evaluate whether the attorneys with whom those communications were made satisfy the above-described criteria such that the in-house attorney was and remained completely segregated from the underlying matter or that the client has waived any conflict or imputed conflict after having such conflict disclosed to it prior to any agreement to continue the representation. If so, the usual rules of privilege will attach. If not, then the trial court should conduct an *in camera* review of SSW's requested discovery and the items on Hunter Maclean's privilege log and require production of communications that implicate the conflict of interest—*i.e.*, those discussing claims the client might have against the firm, known errors in the firm's representation of the client, conflicts in its representation, and other circumstances that would have triggered the firm's duty to advise the client and obtain the client's

---

that the advice or assistance of the attorney is sought and received in matters pertinent to his profession. While the payment of a fee is relevant to the inquiry and may in some circumstances be controlling, an attorney-client relationship may be found to exist where no fee is paid and the payment of a fee does not necessarily demonstrate the existence of the relationship. All that is necessary is a 'reasonable belief' on the part of the would-be client that he or she was being represented by the attorney. A reasonable belief is one which is reasonably induced by representations or conduct on the part of the attorney." (citations and punctuation omitted)).

consent.[67] Any non-privileged evidence must still, of course, comport with the requirements of OCGA § 9-11-26 (b) (1).[68]

As to the requests pertaining to Darla McKenzie, the trial court—having determined that the information is privileged—should evaluate those items *in camera* to determine whether the privilege has been overcome to some extent pursuant to the general guidelines established above.[69] In other words, the trial court must determine whether the attorneys with whom McKenzie communicated—aside from any necessary exchange of background information for investigation and research

---

[67] *See Thelen Reid & Priest LLP v. Marland*, No. C 06-2071 VRW, 2007 WL 578989, at *8 (II) (A) (N.D. Cal. Feb. 21, 2007); *see also* Ga. Rules of Prof'l Conduct R. 1.4 (a) (1) ("A lawyer shall . . . promptly inform the client of any decision or circumstance with respect to which the client's informed consent . . . is required by these Rules . . . .").

[68] OCGA § 9-11-26 (b) (1) ("Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party . . . .").

[69] *See supra* note 65; *see also* Ronald D. Rotunda, *Why Lawyers Are Different & Why We Are the Same*, 44 AKRON LAW REV. 679, 708-09 (VIII) ("The ethics rules envisage that the law firm should advise the firms' client of . . . possible malpractice. It does not matter whether inside counsel or outside counsel has advised that there is malpractice. The case law shows that if the law firm discovers that it has committed malpractice, the lawyer should inform the law firm's client, as part of its duty to keep the client well-informed. The law firm's obligation does not depend on whether inside or outside counsel has delivered the bad news." (footnotes omitted)).

purposes—were subject to an imputed conflict of interest and, if so, continue to apply the analysis discussed *supra.*

b. *Work Product Doctrine.*

Georgia law protects work product under OCGA § 9-11-26, which provides in pertinent part that

> a party may obtain discovery of documents and tangible things otherwise discoverable [and relevant] and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including his attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of his case and that he is unable without undue hardship to obtain the substantial equivalent of the materials by other means.[70]

And even if the required showing is made, "the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation."[71]

---

[70] OCGA § 9-11-26 (b) (3).

[71] *Id.*

44

Much of our analysis of the attorney-client privilege *supra* applies to the work-product privilege as well.[72] Thus, as with the attorney-client privilege, the work-product doctrine is not absolute, and attorneys "cannot cloak themselves in its mantle when their mental impressions and opinions are directly at issue."[73] Accordingly, the doctrine should not apply when a client, as opposed to some other party, seeks to discover an attorney's mental impressions because "[i]t cannot shield a lawyer's papers from discovery in a conflict of interest context anymore than can the attorney-client privilege."[74]

On remand, the trial court should conduct an *in camera* review of the items claimed as work product pursuant to Hunter Maclean's defense efforts under the same standard we have set forth above for determining whether a conflict exists so as to overcome the attorney-client privilege. Additionally, the court should again consider whether those documents meet the standard set forth by our Supreme Court in *Swift,*

---

[72] *See Thelen Reid & Priest LLP*, 2007 WL 578989, at *8 (II) (B).

[73] *Id.*

[74] *Id.* (punctuation omitted).

45

*Currie, McGhee & Hiers v. Henry* such that they rightfully belong to SSW because they were created in the course of Hunter Maclean's representation of SSW.[75]

Accordingly, for all the foregoing reasons, we vacate the trial court's order and remand this case for proceedings consistent with this opinion.

*Judgment vacated and case remanded with direction. Ellington, C. J., and Phipps, P. J., concur.*

---

[75] 276 Ga. at 39 ("[I]t is presumed that a client is entitled to discover any document which the attorney created during the course of representation. However, good cause to refuse discovery would arise where disclosure would violate an attorney's duty to a third party." (citation omitted)).