RFF Family Partnership, LP *vs*. Burns & Levinson, LLP,
& others.[1]

Suffolk. March 4, 2013. - July 10, 2013.

Present: Ireland, C.J., Spina, Botsford, Gants, Duffly, & Lenk, JJ.

*Privileged Communication. Evidence,* Privileged communication. *Attorney at Law,* Attorney-client relationship, In-house counsel. *Partnership,* Attorneys. *Rules of Professional Conduct.*

Confidential communications between law firm attorneys and a law firm's in-house counsel concerning a malpractice claim asserted by a current client of the firm are protected from disclosure to the client by the attorney-client privilege, where the law firm has designated an attorney or attorneys within the firm to represent the firm as in-house counsel; where the in-house counsel has not performed any work on the client matter at issue or a substantially related matter; where the time spent by the attorneys in these communications with in-house counsel is not billed to a client; and where the communications are made in confidence and kept confidential. [706-724]

Civil action commenced in the Superior Court Department on June 13, 2012.

A motion for a protective order was considered by *Thomas P. Billings*, J.

A proceeding for interlocutory review was heard in the Appeals Court by *Gary S. Katzmann*, J. The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Richard E. Briansky* (*Amy B. Hackett* with him) for the plaintiff.

*Thomas E. Peisch* (*Erin K. Higgins, Andrew R. Dennington, & Russell F. Conn* with him) for Burns & Levinson, LLP, & others.

*Jared M. Barnes*, for Boston Bar Association, amicus curiae, was present but did not argue.

[1]Michael MacClary, Francis Perkins, and Certain Underwriters at Lloyd's, London.

The following submitted briefs for amici curiae:

*Roy A. Bourgeois & Benjamin C. Rudolf* for Association of Professional Responsibility Lawyers.

*Laurel G. Bellows,* of Illinois, *& Holly M. Polglase & Matthew C. Kalin* for American Bar Association.

*Richard M. Zielinski, Timothy J. Dacey, & Gary M. Ronan* for Attorneys' Liability Assurance Society, Inc.

GANTS, J. The issue presented on appeal is whether confidential communications between law firm attorneys and a law firm's in-house counsel concerning a malpractice claim asserted by a current client of the firm are protected from disclosure to the client by the attorney-client privilege. We conclude that they are, provided that (1) the law firm has designated an attorney or attorneys within the firm to represent the firm as in-house counsel, (2) the in-house counsel has not performed any work on the client matter at issue or a substantially related matter, (3) the time spent by the attorneys in these communications with in-house counsel is not billed to a client, and (4) the communications are made in confidence and kept confidential. Because these criteria were met in this case, we affirm the judge's order allowing the defendant law firm and its attorneys to invoke the attorney-client privilege to preserve the confidentiality of these communications.[2]

*Background.* The plaintiff RFF Family Partnership, LP (RFF), made a $1.4 million commercial loan to Link Development, LLC (Link), secured by what RFF understood was a first mortgage on Link's real property in Saugus (property). RFF retained Burns & Levinson, LLP (B&L or law firm), to investigate the title of the property, to conduct the necessary due diligence and draft the required documents, and, subsequently, to accomplish RFF's foreclosure on the mortgage when Link defaulted in its payment.

On March 25, 2010, the day before the scheduled foreclosure sale, an assignee of a different mortgage on the property filed an action in the Land Court seeking to enjoin RFF's foreclosure on the grounds that its mortgage was superior to that of RFF.

---

[2]We acknowledge the amicus briefs of the Association of Professional Responsibility Lawyers; the American Bar Association; the Attorneys' Liability Assurance Society, Inc.; and the Boston Bar Association.

Although a judge of the Land Court denied the assignee's emergency motion to enjoin the foreclosure and the sale went ahead as scheduled, the assignee continued to press its claim in the Land Court that its lien was superior to RFF's and that the foreclosure was therefore invalid. Soon after the Land Court action was filed, RFF's title insurer retained another law firm, Prince Lobel Tye LLP (Prince Lobel), to represent RFF in that action, but B&L continued to represent RFF in connection with the postforeclosure sale of the property.

On March 2, 2011, almost one year after the foreclosure sale, while B&L was representing RFF in active negotiations with a third party for the sale of the foreclosed property, Prince Lobel sent a "notice of claim" to B&L attorney Shepard Davidson, alleging that B&L "breached its obligations to RFF by, among other things, failing to identify and payoff an existing mortgage of record in favor of" another lender, "failing to record a subordination agreement for another existing mortgage of record," and "failing to inform RFF of these outstanding liens." Prince Lobel alleged that RFF "has suffered and continues to suffer damages" as a result of "B&L's legal malpractice and breach of contract," and demanded that B&L indemnify RFF for the losses incurred. Prince Lobel requested that B&L contact it "no later than Tuesday, March 8, 2011 to discuss this matter." Attached to the letter was a draft complaint including two counts of liability against B&L and two B&L attorneys, Michael Mac-Clary and Francis Perkins.

The judge found that, on Friday, March 4, MacClary, Perkins, and Davidson sought advice as to how B&L should respond to the notice of claim from David Rosenblatt, who was the partner at B&L designated to respond to ethical questions and risk management issues on behalf of B&L, and who had not worked on any matters for RFF. B&L did not bill RFF for any of the time devoted to these internal communications concerning the notice of claim.

On Monday, March 7, MacClary sent a letter to RFF's principal, Robert F. Freedman, with a copy sent to Prince Lobel, stating:

"As I am sure you are aware, we have received [the notice

of claim] from your counsel . . . contemplating a law suit against our firm. Additionally, you have significant unpaid legal fees and have not made a payment to us for several months. Under these circumstances, we cannot continue representing you. Accordingly, we are withdrawing from further representation effective immediately."

After receiving the letter, Freedman told MacClary that Prince Lobel had not been authorized to file or threaten any litigation against B&L on RFF's behalf, and that he wanted B&L to continue to represent RFF in connection with its efforts to sell the property. On March 17, MacClary sent a letter to Freedman stating that, before B&L would recommence its representation of RFF, it needed written confirmation that RFF had not engaged Prince Lobel to bring a claim against B&L or its attorneys. Freedman countersigned this letter to provide the requested confirmation, and B&L thereafter resumed its representation and continued to represent RFF in connection with its efforts to sell the property.

On June 13, 2012, after B&L had concluded its representation of RFF, RFF filed an action in the Superior Court against B&L, MacClary, and Perkins (collectively, B&L defendants), which, as amended, alleged, among other claims, legal malpractice, negligent misrepresentation, and intentional misrepresentation.[3] RFF noticed the depositions of MacClary and Perkins, and of B&L's designee pursuant to Mass. R. Civ. P. 30 (b) (6), 365 Mass. 780 (1974). The B&L defendants moved for a protective order to preserve, among other things, the confidentiality of what they contended were privileged communications with Rosenblatt regarding B&L's reply to the notice of claim. The judge allowed the B&L defendants' motion for a protective order to the extent that he allowed B&L's attorney to instruct Davidson, MacClary, Perkins, and Rosenblatt not to answer questions that would reveal the content of the privileged communications among them regarding the notice of claim.[4] RFF sought leave to file an interlocutory appeal of the protec-

---

[3]Burns & Levinson, LLP (B&L or law firm), had been notified in advance of the filing of a complaint by RFF Family Partnership, LP (RFF), and informed Freedman on June 8 that it would withdraw from any further representation of RFF.

[4]The judge also allowed RFF's motion to compel the production of certain

tive order under G. L. c. 231, § 118, and a single justice of the Appeals Court granted the request. We transferred the appeal to this court on our own motion.

*Discussion.* RFF on appeal claims, in essence, that it is entitled to discovery of the confidential communications between Rosenblatt, B&L's in-house counsel for ethical and risk management issues, and the B&L attorneys who had performed legal work for RFF that occurred during the time period between B&L's receipt of the notice of claim threatening a legal malpractice suit (March 2) and B&L's first withdrawal from the representation (March 7). Specifically, RFF seeks to learn what was said when Rosenblatt met with MacClary, Perkins, and Davidson on March 4 to discuss a response to the notice of claim. RFF does not claim that it is entitled to discovery of any confidential communications between Rosenblatt and the other B&L attorneys that may have occurred before B&L received the notice of claim, or after B&L's withdrawal from the representation.

RFF argues that when an attorney in a law firm seeks legal advice from in-house counsel regarding how the attorney or the firm should respond to a claim or threatened claim of malpractice brought by a current client, these communications are not protected from disclosure to the client unless the law firm, *before* seeking the advice, has either withdrawn from the representation or fully disclosed to the client that the law firm and client have a conflict of interest and obtained the client's informed consent for the law firm to seek legal advice. RFF contends that, although these attorney-client communications may be protected from disclosure to anyone other than the cli-

documents and the answer to certain requests for admission. As to the motion to compel the production of documents, the judge found that B&L, MacClary, & Perkins (collectively, B&L defendants) failed to carry their burden of establishing that the documents were privileged because they failed either to produce a privilege log as required by Mass. R. Civ. P. 26 (b) (5), as appearing in 450 Mass. 1406 (2008), or otherwise adequately to describe the documents in their possession "so as to permit a determination of whether or not they are privileged, either as an attorney-client communication or as attorney work product." As to the request to compel answers to requests for admissions, the judge found that the B&L defendants' objections to production based on the attorney-client privilege, the work product doctrine, relevance, and overbreadth were "frivolous." The B&L defendants have not appealed the allowance of RFF's motion to compel as to these requests.

ent, the attorney-client privilege does not protect them from disclosure to the client because of the fiduciary duty that a law firm owes its client to disclose all communications relevant to the representation, and because, when a law firm represents itself in an adversarial matter against its current client, the law firm creates a conflict of interest in violation of Mass. R. Prof. C. 1.7, as amended, 430 Mass. 1301 (1999) (rule 1.7).[5]

Neither this court nor any other court of last resort in the United States appears to have addressed the applicability of the attorney-client privilege to a law firm's in-house communications concerning a current client. As the Court of Appeals of Georgia recently described, "To put it plainly, we are in uncharted jurisprudential waters." *Hunter, Maclean, Exley & Dunn, P.C.* v. *St. Simons Waterfront, LLC*, 317 Ga. App. 1, 13 (2012) (*Hunter*).

As we set sail on these waters, we recognize legal principles that are in well-established safe harbors. "The classic formulation of the attorney-client privilege, which we indorse, is found in 8 J. Wigmore, Evidence § 2292 (McNaughton rev. ed. 1961): '(1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from

---

[5]Rule 1.7 of the Massachusetts Rules of Professional Conduct, as amended, 430 Mass. 1301 (1999), provides:

> "(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:
>
> > "(1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and
> >
> > "(2) each client consents after consultation.
>
> "(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:
>
> > "(1) the lawyer reasonably believes the representation will not be adversely affected; and
> >
> > "(2) the client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved."

disclosure by himself or by the legal adviser, (8) except the protection be waived.' " *Commissioner of Revenue* v. *Comcast Corp.*, 453 Mass. 293, 303 (2009). See generally Mass. G. Evid. § 502(a), (b) (2013). "[T]he privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice." *Upjohn Co.* v. *United States*, 449 U.S. 383, 390 (1981) (*Upjohn*). "The privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client." *Id.* at 389. See *Commissioner of Revenue* v. *Comcast Corp.*, *supra*; *Suffolk Constr. Co.* v. *Division of Capital Asset Mgt.*, 449 Mass. 444, 448-449 (2007). "[I]f the purpose of the attorney-client privilege is to be served, the attorney and client must be able to predict with some degree of certainty whether particular discussions will be protected. An uncertain privilege, or one which purports to be certain but results in widely varying applications by the courts, is little better than no privilege at all." *Upjohn*, *supra* at 393.

When a corporation employs an attorney to serve as its in-house counsel, the corporation is the attorney's client, but confidential communications between the in-house counsel and the corporation's employees that are intended to help counsel to provide the corporation with sound legal advice are protected by the attorney-client privilege. See *id.* at 391-392; *Clair* v. *Clair*, 464 Mass. 205, 215-216 (2013). Similarly, when a governmental entity employs an attorney to serve as its in-house legal counsel, the entity is the client, but confidential communications between the counsel and the entity's employees "undertaken for the purpose of obtaining legal advice or assistance are protected under the normal rules of the attorney-client privilege." *Suffolk Constr. Co.* v. *Division of Capital Asset Mgt.*, *supra* at 450.

As one leading legal commentator regarding this subject has noted:

> "Law firms, like corporations, face 'a vast and complicated array of regulatory legislation,' where the line between permissible and prohibited conduct is not always 'an in-

stinctive matter.' In addition to state and federal law, includ-
ing civil liability for legal malpractice, lawyers also are
subject to an elaborate web of professional regulation,
including state-by-state ethics rules, formal and informal
bar opinions, judicial regulation, and federal agency
regulation. Lawyers engaged in transnational practice face
additional layers of regulation as well as complex choice
of law questions about which regulations apply."

Chambliss, The Scope of In-Firm Privilege, 80 Notre Dame L.
Rev. 1721, 1756 (2005), quoting *Upjohn, supra* at 392. To ad-
dress these increasingly complex issues and to comply with
their partners' obligation under Mass. R. Prof. C. 5.1 (a), 426
Mass. 1405 (1998), to "make reasonable efforts to ensure that
[their law firm] has in effect measures giving reasonable assur-
ance that all lawyers in the firm conform to the Rules of Profes-
sional Conduct," a large and increasing number of law firms
have appointed one or more attorneys within the firm to serve
as in-house or ethical counsel. See Mass. R. Prof. C. 5.1 com-
ment 2 ("Some firms . . . have a procedure whereby junior
lawyers can make confidential referral of ethical problems
directly to a designated senior partner or special committee");
American Bar Association (ABA) Comm. on Ethics and Prof'l
Responsibility, Formal Op. 08-453, at 1-2 (2008) ("Increas-
ingly, firms address their obligations under [Model Rule of
Professional Conduct] 5.1 by . . . designating an individual
lawyer or a committee to counsel the firm or any individual in
the firm on questions of professional conduct as applied to the
firm or to lawyers within the firm"). "By encouraging ques-
tions, providing resources, and monitoring internal policies and
procedures, firm counsel may dramatically improve the quality
of law firm self-regulation." Chambliss, *supra* at 1758. See
Chambliss & Wilkins, The Emerging Role of Ethics Advisors,
General Counsel, and Other Compliance Specialists in Large
Law Firms, 44 Ariz. L. Rev. 559, 560-561 (2002) ("Research in
other organizational contexts shows that such specialists tend to
promote the development of compliance procedures within firms,
and may play a leading role in defining industry standards for
compliance").

Where a law firm designates one or more attorneys to serve

as its in-house counsel on ethical, regulatory, and risk manage-
ment issues that are crucial to the firm's reputation and financial
success, the attorney-client privilege serves the same purpose as
it does for corporations or governmental entities: it guarantees
the confidentiality necessary to ensure that the firm's partners,
associates, and staff employees provide the information needed
to obtain sound legal advice. See *Hertzog, Calamari & Gleason*
v. *Prudential Ins. Co. of Am.*, 850 F. Supp. 255, 255 (S.D.N.Y.
1994) ("No principled reason appears for denying . . . attorney-
client privilege to a law partnership which elects to use a partner
or associate as counsel of record in a litigated matter"). "[B]road
protection of communications with law firm in-house counsel,
including communication about the representation of a current
client of the firm, . . . would encourage firm members to seek
early advice about their duties to clients and to correct mistakes
or lapses, if possible, to alleviate harm." Chambliss, *supra* at
1724. As the United States District Court for the Southern Dis-
trict of Ohio recently noted:

> "[I]ndividual lawyers who come to the realization that
> they have made some error in pursuing their client's legal
> matters should be encouraged to seek advice promptly
> about how to correct the error, and to make full disclosure
> to the attorney from whom that advice is sought about
> what was done or not done, so that the advice may stand
> some chance of allowing the mistake to be rectified before
> the client is irreparably damaged. If such lawyers believe
> that these communications will eventually be revealed to
> the client in the context of a legal malpractice case, they
> will be much less likely to seek prompt advice from
> members of the same firm."

TattleTale Alarm Sys., Inc. *vs.* Calfee, Halter & Griswold, LLP,
U.S. Dist. Ct., No. 2:10-cv-226, slip op. at 9 (S.D. Ohio Feb. 3,
2011) (TattleTale). Cf. *United States* v. *Mett*, 178 F.3d 1058,
1065 (9th Cir. 1999) ("uncertain attorney-client privilege will
likely result in [Employee Retirement Income Security Act
(ERISA)] trustees shying away from legal advice regarding the
performance of their duties. This outcome ultimately hurts
beneficiaries — all else being equal, beneficiaries should prefer
well-counseled trustees who clearly understand their duties").

One of the professional rules of conduct that all lawyers in a law firm must conform to is Mass. R. Prof. C. 1.7, as amended, 430 Mass. 1301 (1999), which reflects the duty of loyalty a lawyer owes to a client and the obligation not to represent a client whose interests will be adverse to the law firm's own interests without such client's informed consent. See Mass. R. Prof. C. 1.7 & comment 6. However, an attorney's or a law firm's duty of loyalty to a client is not always painted in bright lines. It may not always be clear when the interests of the client and the law firm have become so adverse that withdrawal is required in the absence of client waiver, and even when it is clear that withdrawal is necessary, a law firm may need to consider how to minimize the potential adverse consequences of withdrawal to the client, such as where a law firm's withdrawal may imperil a business deal that is near a closing or where a law firm represents the client, or its subsidiaries, in multiple legal matters. See *Hunter, supra* at 15. The in-house counsel whom the law firm has designated to help its attorneys comply with all applicable ethical rules is the logical counsel to turn to for advice as to how the firm may best comply with rule 1.7, especially where time is of the essence. See TattleTale, *supra* ("by the time a matter has progressed to the point where outside counsel are called in, it may be too late to protect the client from damage"). As the judge in this case noted: "Before the [attorney who receives a notice of claim] can make a fully informed decision concerning the appropriate course, [the attorney] may be well advised to consult counsel who may be better schooled in ethical rules, and will almost certainly be better capable of dispassionate analysis of the problem at hand." Soliciting such advice, whether from an in-house counsel at the law firm or from an attorney at another law firm, is not in and of itself adverse to the client, and doing so may ultimately benefit the client. As the judge also noted, "Ultimately, it is usually in the interests both of the [attorney seeking advice] and of the client that the ethical issues be examined by a competent advisor who has been fully informed of all relevant facts, with none withheld out of fear that the consultation may not remain private." See *id.* Cf. *Hunter, supra* at 15 ("it strains credulity to suggest that there is any basis in Georgia law for adopting a rule that places clients in

the perilous position of having their lawyers withdraw prematurely or without careful advice"); N.Y. St. Bar Ass'n Comm. on Prof. Ethics, Op. 789 (2005) (noting that "[s]eeking advice from an in-house ethics advisor is intended to facilitate the lawyer's proper exercise of professional judgment and a lawyer's appropriate discharge of the duty of loyalty owed to the client in the same way that an outside client's consultation with a lawyer in the firm is intended to facilitate the client's lawful achievement of legitimate objectives," and concluding that lawyer's consideration of either "how to conduct oneself in the future or whether conduct in the past was a violation of the Code . . . serves to reinforce ethical behavior, and informs future conduct").

RFF, however, contends that, once a law firm is threatened with a malpractice claim by a current client, as occurred here, the attorney-client privilege does not protect confidential communications between its in-house counsel and its other attorneys, even if the purpose of the communications is to seek advice as to how the law firm should proceed ethically and protect itself against the risk of financial loss and damage to its reputation, unless the law firm first either withdraws from the representation or fully advises the client about the conflict of interest and obtains the consent of the client to engage in such communications. If this were the law, an attorney threatened with a malpractice claim would have four practical alternatives: first, he could withdraw from the representation without first consulting with better informed and more dispassionate in-house ethics counsel; second, he could advise the client of the conflict without first consulting with in-house counsel, and seek the client's consent to confer with in-house counsel; third, he could confer with in-house counsel without first having withdrawn from the representation or obtaining the client's informed consent, recognizing that the communications would not be protected from disclosure to the client; or fourth, he could retain an attorney in another law firm to discuss how best to proceed.

The first alternative poses the risk that a law firm, without the benefit of expert advice, may unnecessarily withdraw from a representation where the apparent conflict was illusory or reparable, or withdraw without adequately protecting the client's

interests. The second alternative poses the risk that the law firm may advise the client about the conflict before itself obtaining the advice that would enable it better to understand the conflict. The third alternative poses the risk that the information provided to in-house counsel will be withheld or "sugar-coated" because of the risk of disclosure to the client, and the advice received will suffer from the lack of candor. See *Upjohn*, *supra* at 389. The fourth alternative, apart from the additional cost to the law firm, may delay the receipt of the ethical advice because new counsel will need to be retained and the new counsel's law firm will need to complete its own conflicts check.[6] None of these alternatives best serve the interests of the client. Consequently, the rule proposed by RFF would be dysfunctional, both to the client and the law firm. See TattleTale, *supra*; *Hunter*, *supra* at 15.

RFF essentially contends that legal doctrine should trump functionality, and that we should join other jurisdictions in adopting the "fiduciary" and "current client" exceptions to the attorney-client privilege, each of which, RFF claims, would require B&L to disclose the allegedly privileged communications in this case. Although Massachusetts law recognizes several exceptions to the attorney-client privilege, see Mass. G. Evid. § 502(d) (2013), the law of the Commonwealth has not yet recognized either of the proposed exceptions. We address each of the proposed exceptions in turn.

1. *The fiduciary exception.* RFF argues that we should recognize and adopt the so-called "fiduciary exception" to the attorney-client privilege. The United States Supreme Court recently described this exception as follows:

> "English courts first developed the fiduciary exception as a principle of trust law in the 19th century. The rule was that when a trustee obtained legal advice to guide the administration of the trust, and *not for the trustee's own*

---

[6]"To hold that a law firm must always seek guidance outside its halls in order to preserve an attorney-client relationship . . . is simply impractical in the day-to-day life of many law firms, when issues of professional responsibility frequently require prompt responses most usefully provided by lawyers knowledgeable about the firm, its client relationships and its culture." N.Y. State Bar Ass'n Comm. on Prof. Ethics, Op. 789 (2005).

> *defense in litigation*, the beneficiaries were entitled to the production of documents related to that advice. . . . The courts reasoned that the normal attorney-client privilege did not apply in this situation because the legal advice was sought for the beneficiaries' benefit and was obtained at the beneficiaries' expense by using trust funds to pay the attorney's fees." (Emphasis added.)

*United States* v. *Jicarilla Apache Nation*, 131 S. Ct. 2313, 2321 (2011) (*Jicarilla Apache Nation*).

Under the fiduciary exception, where a trustee, acting on behalf of his beneficiaries, uses trust funds to obtain legal advice regarding a trust matter, such as advice from a tax attorney regarding a trust tax return, "the beneficiaries [are] the 'real clients' of the attorney who . . . advised the trustee on trust-related matters, and therefore the attorney-client privilege properly belong[s] to the beneficiaries rather than the trustees." *Id.* at 2322, quoting *Riggs Nat'l Bank of Wash., D.C.* v. *Zimmer*, 355 A.2d 709, 711-712 (Del. Ch. 1976) (*Zimmer*). In contrast, where legal advice is procured "at the trustee's *own* expense and for his *own* protection" (emphasis in original), such as where the trustee is defending himself against the threat of litigation brought by a beneficiary, the fiduciary exception does not apply and the communications between the trustee and her attorney remain privileged. *Jicarilla Apache Nation, supra*, quoting *Zimmer, supra* at 712. See *United States* v. *Mett*, 178 F.3d 1058, 1063-1064 (9th Cir. 1999) ("by agreeing to serve as a fiduciary, a . . . trustee is not completely debilitated from enjoying a confidential attorney-client relationship. . . . [W]here [an ERISA] plan fiduciary retains counsel in order to defend herself against the plan beneficiaries [or the government acting in their stead], the attorney-client privilege remains intact"); *Garvy* v. *Seyfarth Shaw LLP*, 966 N.E.2d 523, 535 (Ill. App. Ct. 2012) ("fiduciary-duty exception does not, however, apply to legal advice rendered concerning the personal liability of the fiduciary or in anticipation of adversarial legal proceedings against the fiduciary").

"The Federal Courts of Appeals apply the fiduciary exception," but "[s]ome state courts have altogether rejected the notion that the attorney-client privilege is subject to a fiduciary

exception." *Jicarilla Apache Nation, supra* at 2321-2322 & n.3, and cases cited. We need not decide in this case whether Massachusetts law should adopt this exception, because it would not apply here even if we were to adopt it. The attorney-client communications whose discovery is at issue in this case were "for the [law firm's] own defense" in the litigation threatened in the Prince Lobel letter. See *id.* at 2321. The attorneys' time was not billed to RFF, because B&L, not RFF, was the "real client" of the in-house counsel whose legal advice was sought. See *id.* at 2322.

RFF, however, contends that, where a law firm continues to represent a client despite being threatened with a claim of legal malpractice, all attorney-client communications are discoverable by the client under the fiduciary exception, including communications made for the law firm's *own defense in litigation*, because the duties owed by a law firm to its current client are "paramount to its own interests." *Koen Book Distribs.* v. *Powell, Trachtman, Logan, Carrle, Bowman & Lombardo, P.C.*, 212 F.R.D. 283, 285-286 (E.D. Pa. 2002). The premise of this argument is that, when the threat of a conflict emerges, a current client is entitled to learn all that its attorney has said regarding the representation, even what the attorney has said to the law firm's attorney in defense against the client's claim. Consequently, in oral argument, RFF suggested that the fiduciary exception would exclude from the attorney-client privilege not only confidential communications between the attorneys for a current client and in-house counsel, but also confidential communications between a current client's attorneys and outside counsel that were intended to provide legal advice to the attorneys to defend against a client's threatened claim. This proposed rule would be the most dysfunctional of all because it would deny a law firm and its attorneys any protection provided by the attorney-client privilege, even if it sought the advice of outside counsel, unless the law firm first withdrew from the representation or obtained the consent of the client.

Nor is such a draconian rule necessary to protect the interests of clients. Preserving the privileged nature of these communications does not affect a law firm's duty to provide a client with "full and fair disclosure of *facts* material to the client's interests"

(emphasis added), *Hendrickson* v. *Sears*, 365 Mass. 83, 90 (1974), even if those facts were disclosed or learned during a privileged communication to in-house or outside counsel. *Chambers* v. *Gold Medal Bakery, Inc.*, 464 Mass. 383, 392 (2013). See *Upjohn*, *supra* at 395-396, quoting *Philadelphia* v. *Westinghouse Elec. Corp.*, 205 F. Supp. 830, 831 (E.D. Pa. 1962) ("A fact is one thing and a communication concerning that fact is an entirely different thing"). Nor does the privileged nature of communications with in-house or outside counsel affect a law firm's obligation to provide the client with appropriate legal advice, even if that advice was informed by the law firm's confidential consultation with in-house or outside counsel. See ABA Formal Op. 08-453, *supra* at 2 (lawyer required to explain matters sufficiently to permit client to make informed decision about representation, but "[n]ormally, there would be no need to explain that a conclusion as to the ethical propriety of a course of conduct was based on consultation within the firm or with an expert outside the firm"). In short, a client is entitled to full and fair disclosure of facts that are relevant to the representation, including any bad news, and to sound legal advice from its law firm. But a client is not entitled to revelation of the law firm's privileged communications with in-house or outside counsel where those facts were presented and the sound legal advice was formulated if those communications were conducted for the law firm's own defense against the client's adverse claims. As the court noted in TattleTale, *supra* at 10:

> "It is simply not the case that a legal malpractice plaintiff will be functionally unable to prove negligence without gaining access to intra-firm communications made during loss prevention efforts. The client still has access to every communication between the client and the firm and to every communication made by the lawyer, whether within the firm or outside of it, that reflects how the lawyer was carrying out the client's legal business."

For these reasons, we reject RFF's overbroad interpretation of the fiduciary exception.

2. *The current client exception.* The so-called "current client" exception is most clearly articulated by the United States

Bankruptcy Court for the Northern District of California in In re SonicBlue, Inc., U.S. Bankr. Ct., No. 03-51775, slip op. at 12 (N.D. Cal. Jan. 18, 2008), where the court held:

> "[W]hen a law firm chooses to represent itself, it runs the risk that the representation may create an impermissible conflict of interest with one or more of its current clients. In light of these ethical concerns, the courts that have considered the issue have resoundingly found that, where conflicting duties exist, the law firm's right to claim privilege must give way to the interest in protecting current clients who may be harmed by the conflict. . . . As a result, a law firm cannot assert the attorney-client privilege against a current outside client when the communications that it seeks to protect arise out of self-representation that creates an impermissible conflicting relationship with that outside client."

The majority of courts that have been confronted with the issue before us have invoked some variation of the current client exception and ruled that, where a law firm seeks legal advice from its in-house counsel in response to an adverse claim brought by a current outside client, the communications are not protected from disclosure to the outside client.[7]

---

[7] We note that the rationales used by courts in reaching this conclusion are varied, and therefore the cases do not readily coalesce into a single coherent theory of why such a conclusion must be reached. See, e.g., Cold Spring Harbor Lab. *vs.* Ropes & Gray LLP, U.S. Dist. Ct., No. 11-10128, slip op. at 3-4 (D. Mass. July 19, 2011) (where law firm defendant attempted to assert attorney-client privilege over communications between itself and its in-house counsel, "absent an affirmative act on the part of [law firm] that would have caused [client] to know that [law firm] had unequivocally ended its representation, [law firm's] fiduciary duty to [client] overrides any claim of privilege"); Asset Funding Group, LLC *vs.* Adams & Reese, LLP, U.S. Dist. Ct., No. 07-2965, slip op. at 9 (E.D. La. Nov. 17, 2008) ("A law firm's communication with in-house counsel is not protected by the attorney-client privilege if the communication implicates or creates a conflict between the law firm's fiduciary duties to itself and its duties to the client seeking to discover the communications"); Burns ex rel. *Office of Pub. Guardian* v. *Hale & Dorr LLP*, 242 F.R.D. 170, 173 (D. Mass. 2007) (where " 'client' invoking the privilege is [the law firm] itself, which is being represented by another lawyer of the firm," none of interests justifying attorney-client privilege is served); *Koen Book Distribs.* v. *Powell, Trachtman, Logan, Carrle, Bowman & Lombardo, P.C.*, 212 F.R.D. 283, 285-286 (E.D. Pa. 2002) (because firm did not withdraw

Although the legal analysis in these cases differs, the underlying theme seems to be that, where a current outside client (here, RFF) threatens legal action against a law firm (here, B&L) and the attorneys in the firm seek legal advice from the law firm's in-house counsel (here, Rosenblatt), the law firm is both the attorney for the outside client and itself a client, and these two "clients" have conflicting interests. Applying this analysis to the case before us, Rosenblatt, the in-house counsel, represents the law firm in defending against RFF's threatened claim, but under the rule of imputation, Rosenblatt is deemed also to represent RFF, even if he has performed no legal work for RFF. See Mass. R. Prof. C. 1.10 (a), 426 Mass. 1346 (1998) ("While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rule[] 1.7"); Rule 1.10(a) of the ABA Model Rules of Professional Conduct (2012) (same). Pursuant to this analysis, unless and until the law firm has withdrawn from its representation of RFF or obtained a fully-informed waiver of the conflict, Rosenblatt's representation of the law firm against RFF violates Mass. R. Prof. C. 1.7 (a) because it is directly adverse to his imputed representation of RFF.[8] According to the cases applying the "current client" exception, because the law firm and its in-house counsel would

from representation or solicit clients' consent to continue representation, firm could not assert privilege over communications regarding "if and how [it should] continue to represent the clients and how to respond to the clients' communications"); *In re Sunrise Sec. Litig.*, 130 F.R.D. 560, 597 (E.D. Pa. 1989) ("law firm's communication with in house counsel is not protected by the attorney client privilege if the communication implicates or creates a conflict between the law firm's fiduciary duties to itself and its duties to the client seeking to discover the communication"). But see TattleTale Alarm Sys., Inc. *vs.* Calfee, Halter & Griswold, LLP, U.S. Dist. Ct., No. 2:10-cv-226, slip op. at 1, 18 (S.D. Ohio Feb. 3, 2011) (even if law firm had conflict between representing itself and representing its client after client threatened suit against firm, client had "not shown good cause to obtain" privileged communications); *Hunter, Maclean, Exley & Dunn, P.C.* v. *St. Simons Waterfront, LLC,* 317 Ga. App. 1, 12-23 (2012) (where in-house counsel has no involvement in outside representation at issue and law firm is clearly established as client before in-firm communication occurs, communications with in-house counsel protected by attorney-client privilege).

[8]Although none of the courts that have applied the "current client" exception explicitly acknowledges that it is relying on the rule of imputation, most implicitly do so, because their theory is that a conflict of interest arises

effectively be engaged in a conflicting representation without each client's consent, any attorney-client privilege regarding communications between the law firm and its in-house counsel adverse to the current outside client would then be "vitiated," and all such communications between in-house counsel and the law firm's attorneys would be therefore discoverable by the outside client. See In re SonicBlue, Inc., *supra* at 12. See also *In re Sunrise Sec. Litig.*, 130 F.R.D. 560, 597-598 (E.D. Pa. 1989) ("law firm's communication with in[-]house counsel is not protected by the attorney[-]client privilege if the communication implicates or creates a conflict between the law firm's fiduciary duties to itself and its duties to the client seeking to discover the communication").

We find two fundamental flaws in this reasoning. First, it is plain that the rule of imputation in rule 1.10 (a) of both the Massachusetts Rules of Professional Conduct and the ABA Model Rules of Professional Conduct generally prohibits attorneys in the same law firm from representing outside clients that are adverse to each other, but there is nothing in the language of or commentary to these rules to suggest that the rule of imputation was meant to prohibit an in-house counsel from providing legal advice to his own law firm in response to a threatened claim by an outside client. Nor does it make sense to apply the rule in this context. "The primary reasons for imputation are to '[give] effect to the principle of loyalty to the client as it applies to lawyers who practice in a law firm' and to prevent the misuse of confidential information by lawyers in the same firm." Chambliss, *supra* at 1747-1748, quoting Rule 1.10 comment 2 of the ABA Model Rules of Professional Conduct (2003).[9] Neither purpose is accomplished by applying the rule of imputation to the representation of a law firm by its in-house counsel.

The rule of imputation safeguards the duty of loyalty by prohibiting a law firm from representing two clients who are adverse to each other, where loyalty to one client may risk disloyalty to

---

between the law firm's representation of itself through the in-house counsel and the law firm's (i.e., the in-house counsel's) simultaneously adverse representation of the outside client.

[9]The quoted portion of this statement also appears in Mass. R. Prof. C. 1.10 comment 6, 426 Mass. 1346 (1998).

the other client. A law firm can avoid conflicting loyalties by refusing to represent an adverse outside client. But where a law firm is already representing a client and that client threatens to bring a claim against the law firm, the potential conflict between the law firm's loyalty to the client and its loyalty to itself cannot be avoided and must instead be addressed, either by resolving the conflict satisfactorily to the client or withdrawing from the representation. However, a law firm is not disloyal to a client by seeking legal advice to determine how best to address the potential conflict, regardless of whether the legal advice is given by in-house counsel or outside counsel. See Chambliss, *supra* at 1748 (law firm's duty of loyalty "to the client does not prevent the firm from attempting to defend against client claims," and "effort to defend is no more 'disloyal' when it involves inside rather than outside counsel"). Applying the rule of imputation in such circumstances therefore would not avoid conflicting loyalties or prevent disloyalty; it would simply prevent or delay a law firm from seeking the expertise and advice of in-house counsel in deciding what to do where there is a potential conflict.

The rule of imputation also protects the confidentiality of client information by eliminating the risk that information provided by one client will be misused to the advantage of an adverse client. When the adverse client, however, is the law firm itself, the outside client's information is not protected from the law firm client by imputing the conflict to the in-house counsel because the law firm already possesses the outside client's information, and it has a right to defend itself against the outside client's adversarial claims even to the point of disclosing information given to the law firm in confidence. See Mass. R. Prof. C. 1.6 (b) (2), 426 Mass. 1435 (1998) (lawyer may reveal confidential information relating to representation of client "to the extent the lawyer reasonably believes necessary to establish a claim or defense on behalf of the lawyer in a controversy between the lawyer and the client"). See Rule 1.6(b)(5) of the ABA Model Rules of Professional Conduct (2012) (same).[10] Even if

---

[10]In 2002, the ABA amended its Model Rules of Professional Conduct explicitly to authorize a lawyer to reveal confidential information relating to the representation of a client "to the extent the lawyer reasonably believes necessary . . . to secure legal advice about the lawyer's compliance with these

the rule of imputation were to prohibit a law firm's in-house counsel from representing the law firm against an adverse outside client, the law firm would still be entitled to reveal confidential client information to outside counsel where necessary to the law firm's own defense. "Thus, the imputation of conflicts to firm in-house counsel adds nothing to the protection of the outside client's interests in loyalty or confidentiality." Chambliss, *supra*.

Second, even where a law firm actually violates Mass. R. Prof. C. 1.7 (a) by representing two clients with adverse interests without the consent of each client, "counsel's failure to avoid a conflict of interest should not deprive the client of the privilege." *In re Teleglobe Communications Corp.*, 493 F.3d 345, 369 (3d Cir. 2007) (*Teleglobe*), quoting *Eureka Inv. Corp. v. Chicago Title Ins. Co.*, 743 F.2d 932, 938 (D.C. Cir. 1984). "[T]he black-letter law is that when an attorney (improperly) represents two clients whose interests are adverse, the communications are privileged against each other notwithstanding the lawyer's misconduct." *Teleglobe*, *supra* at 368. Applying this "black-letter law," a client should not be deprived of the benefit of the attorney-client privilege because of its attorney's violation of rule 1.7, even if that "client" is a law firm and the "attorney" is an in-house counsel within that same law firm.

Moreover, Restatement (Third) of the Law Governing Lawyers § 6, at 65-66 (2000), identifies thirteen possible sanctions for a law firm's breach of rule 1.7 by engaging in an impermissible conflict of interest representation. With the exception of the final catch-all remedy of entering an "other sanction," none of these remedies includes disclosure of otherwise privileged communications.[11]

---

Rules." Rule 1.6(b)(4) of the ABA Model Rules of Professional Conduct (2012). To date, rule 1.6 (b) of the Massachusetts Rules of Professional Conduct has not been similarly amended, but our standing advisory committee on the Rules of Professional Conduct is currently completing a review of the Massachusetts rules, including Mass. R. Prof. C. 1.6, and is considering whether to propose our adoption of various amendments made to the ABA rules.

[11]The Restatement (Third) of the Law Governing Lawyers § 6, at 65-66 (2000), provides thirteen judicial remedies "[f]or a lawyer's breach of a duty owed to the lawyer's client or to a nonclient":

"(1) awarding a sum of money as damages;

In law, as in architecture, form should follow function, and we prefer a formulation of the attorney-client privilege that encourages attorneys faced with the threat of legal action by a client to seek the legal advice of in-house ethics counsel before deciding whether they must withdraw from the representation to one that would encourage attorneys to withdraw or disclose a poorly understood potential conflict before seeking such advice. The "current client" exception is a flawed interpretation of the rules of professional conduct that yields a dysfunctional result. See N.Y. St. Bar Ass'n Comm. on Prof. Ethics, Op. 789 (2005) ("We do not believe that the conflicts rules . . . were intended to prohibit ethics consultation when it is most helpful: during the client representation"). As such, we decline to adopt it in Massachusetts.

Instead, because applying the privilege in such contexts will

---

"(2) providing injunctive relief, including requiring specific performance of a contract or enjoining its nonperformance;

"(3) requiring restoration of a specific thing or awarding a sum of money to prevent unjust enrichment;

"(4) ordering cancellation or reformation of a contract, deed, or similar instrument;

"(5) declaring the rights of the parties, such as determining that an obligation claimed by the lawyer to be owed to the lawyer is not enforceable;

"(6) punishing the lawyer for contempt;

"(7) enforcing an arbitration award;

"(8) disqualifying a lawyer from a representation;

"(9) forfeiting a lawyer's fee . . . ;

"(10) denying the admission of evidence wrongfully obtained;

"(11) dismissing the claim or defense of a litigant represented by the lawyer;

"(12) granting a new trial; and

"(13) entering a procedural or other sanction."

In the commentary to this section, the only reference made to the privilege is in the context of a judge's ability to exclude evidence "even if the evidence is not otherwise subject to exclusion because of the attorney-client privilege . . . or the work-product immunity." *Id.* at § 6 comment j, at 70.

often benefit the client and will likely result in increased law firm compliance with ethical obligations, we hold that the attorney-client privilege applies to confidential communications between a law firm's in-house counsel and the law firm's attorneys, even where the communications are intended to defend the law firm from allegations of malpractice made by a current outside client. Such a rule, however, is not without its limits, because we recognize that not every attorney in a law firm is its in-house counsel and not every communication within a law firm is privileged. For the privilege to apply, four conditions must be met. First, the law firm must designate, either formally or informally, an attorney or attorneys within the firm to represent the firm as in-house or ethics counsel, so that there is an attorney-client relationship between the in-house counsel and the firm when the consultation occurs. Second, where a current outside client has threatened litigation against the law firm, the in-house counsel must not have performed any work on the particular client matter at issue or a substantially related matter. See *Hertzog, Calamari & Gleason* v. *Prudential Ins. Co. of Am.*, 850 F. Supp. 255, 255 (S.D.N.Y. 1994) ("The privilege attaches to communications with in-house counsel if the individual in question is acting as an attorney, rather than as a participant in the underlying events"). Third, the time spent by the attorneys in these communications with in-house counsel may not be billed or charged to any outside client. Because the law firm is the client with respect to such communications, their cost must be borne by the law firm. Fourth, as with all attorney-client communications, they must be made in confidence and kept confidential. Where all four conditions are met, we agree with the judge that "[c]ompelled disclosure of the first attorney's communications with ethics counsel . . . does little to advance the interests of the client (who is owed disclosure of material facts whether or not the first attorney has consulted counsel), but does much to undermine the important societal goals served by the attorney-client privilege."

*Conclusion.* Because each of the four conditions was either properly found by the judge or undisputed in this case, we affirm the judge's partial allowance of the B&L defendants' motion for a protective order to enable them to preserve the

confidentiality of privileged attorney-client communications between the law firm and its in-house counsel regarding how B&L should respond to RFF's notice of claim and draft complaint.

*So ordered.*